145  478
150  437
145      478
29 SC ¹333

## P. E. CHAPIN v. CAMBRIA IRON CO.

APPEAL BY DEFENDANT FROM THE COURT OF COMMON PLEAS OF CAMBRIA COUNTY.

Argued October 12, 1891—Decided November 9, 1891.
[To be reported.]

1. When a statement of claim, open to objection for want of perspicuity and clearness, has not been demurred to, no defect therein will be fatal, after trial on the merits, verdict and judgment for the plaintiff, unless

Statement of Facts.

it is shown to have injuriously affected the trial. In such case, the proper amendment will be considered as having been made.

(a) Plaintiff, suing for a balance of salary as superintendent of one of the departments of a corporation, testified that the general manager of the company agreed with him that his salary should be ten thousand dollars per annum, but afterwards directed that his salary be credited on the books of his department at seven thousand dollars, saying that the other three thousand dollars would be paid from the general office.

(b) It was the company's practice, in paying some of its higher officers, to have only a portion of their salaries appear upon the books of the departments with which they were connected, the remainder being paid from and charged to the expense account kept at the general office; but it was denied by defendant that plaintiff was among the officers to whom this practice applied.

(c) Plaintiff was credited monthly, on the books of his department kept under his supervision, with salary at the rate of seven thousand dollars per year, and the sums so credited were paid. A copy of this account was transmitted by him to the company's president. Plaintiff testified, also, that after the death of the general manager, the president admitted the contract to pay the additional three thousand dollars and paid one thousand dollars on account of it:

2. While the book entries and accounts were strong proof of a contract to serve as superintendent at a salary of seven thousand dollars, they did not in any proper sense constitute a written contract which could not be varied or affected by parol evidence; wherefore, the exact nature of the contract between the plaintiff and the company was for the determination of the jury, upon all the evidence.

3. A letter written by the deceased general manager who employed the plaintiff, to another officer of the company, more than two months after the contract of employment was complete and while plaintiff was performing his duties under it, stating that no arrangements had been made with him about salary, was inadmissible for the defendant, being no part of the res gestæ.

Before PAXSON, C. J., STERRETT, GREEN, CLARK, WILLIAMS, McCOLLUM and MITCHELL, JJ.

No. 213 October Term 1890, Sup. Ct.; court below, No. 58 September Term 1888, C. P.

On June 22, 1888, service was made of a summons in an action of assumpsit brought by Philip E. Chapin against the Cambria Iron Company. On September 1, 1888, the plaintiff filed a statement of claim, averring in substance:

That on or about January 1, 1881, the plaintiff made a verbal contract with Daniel J. Morrell, who was then in the employment of and acting for the Cambria Iron Company as

general manager, and was also chairman of the Gautier Steel Company, Limited, then being conducted as an independent organization, but really controlled and managed by the Cambria Iron Co., to become the superintendent of said steel company at an annual salary of ten thousand dollars, the plaintiff being then informed by said Morrell that negotiations were pending and would be consummated for the purchase of said steel company, and its conversion into a department of said iron company of which plaintiff should be general superintendent; that, pursuant to said agreement, the plaintiff left a situation of large profit at Cleveland, O., came to Johnstown, Cambria county, Pa., on March 1, 1881, assumed the position of general superintendent of said steel company, and thereafter discharged its duties; that on July 1, 1881, the works of said steel company were united to and became a part of the Cambria Iron Co., under the title of the Gautier Steel Department of the Cambria Iron Co., and the plaintiff, without any new or further or other contract, but under the direction of the general manager of said iron company, continued as general superintendent of said department until December 31, 1883, his total salary for said term of service amounting to $28,333.34; that, on or about December 1, 1883, the plaintiff was solicited by defendant to accept the position of general manager of defendant's works at Johnstown, the defendant agreeing to pay the plaintiff an annual salary of twelve thousand dollars in said position; that the plaintiff accepted said position and discharged its duties from January 1, 1884, until December 31, 1887, the total salary earned by him therein being $48,000; that the defendant did not pay in full the salary earned by the plaintiff in either of the said positions, balances being left due to him for each year of his service upon which he claimed interest. Then followed a statement of the plaintiff's account against the defendant, exhibiting a claim for $6,901.77 balance due on September 1, 1888, on account of salary as superintendent of the steel department, and a balance of $7,367.42, due September 1, 1888, on account of services as general manager of the defendant company.

The defendant pleaded non-assumpsit and payment with leave.

At the trial, on June 10, 1890, the plaintiff and his wife

### Statement of Facts.

both testified to the making of the contract set out in the statement of claim respecting the superintendency of the Gautier Steel Co., stating that Mr. Morrell, who was plaintiff's father-in-law, came to Cleveland, and after explaining arrangements on foot for making that company a department of the Cambria Iron Co., offered the plaintiff a salary of ten thousand dollars if he would take the superintendency, which offer the plaintiff, after coming to Johnstown and looking over the situation, accepted on February 7th. Plaintiff testified, also, that on the same day, Mr. Morrell wrote a letter to E. Y. Townsend, the president of the Cambria Iron Co., informing him of such acceptance, though the letter did not mention the subject of salary; that the plaintiff saw and read the letter before it was sent, and Mr. Townsend afterwards admitted the receipt of the letter.

Under the by-laws of the Gautier Steel Co., Limited, which were in evidence, the power to appoint and discharge superintendents and fix their salaries, was vested in the board of managers. The by-laws of the Cambria Iron Co., adopted in 1878, authorized the general manager to appoint, fix the salaries of, and discharge certain specified superintendents of departments, "and such other agents and clerks as may be necessary."

To rebut the plaintiff's allegations as to the making of an express contract in regard to the amount of his salary on February 7th, the defendant made the following offer of a letter from Mr. Morrell (who had died before the action was brought), to Dr. C. S. Wurts, who was one of the managers of the Gautier Steel Co. and vice-president of the Cambria Iron Company:

Defendant offers letter of Daniel J. Morrell, dated May 4, 1881, to Dr. C. S. Wurts, as part of the res gestæ of the employment, and in relation to the salary of Mr. Chapin; to be followed by proof that no letter was received by the Cambria Iron Co., or by Mr. Townsend informing him or the company of Mr. Chapin's acceptance of Mr. Morrell's offer, as testified to by Mr. Chapin.

The letter was as follows:

"JOHNSTOWN, Pa., May 4, 1881.

"DR. C. S. WURTS.

My dear Sir: Yours of yesterday is at hand, and I note the action of the board of managers of the Gautier Company, Lim-

Statement of Facts.

ited, in accepting the resignation of Mr. Charles Douglass and confirming the appointment of Mr. Chapin as superintendent. I have made no arrangement with Mr. C. as to salary, and shall wish to have that question considered when I am next in the city, unless we can sooner have a meeting of the board here, . . . . Yours truly,

"D. J. MORRELL."

Objected to, as incompetent to affect the plaintiff, and irrelevant; that it is no part of the res gestæ of the employment of Mr. Chapin, as it is written more than two months after he entered the employ of the Gautier Steel Co., Limited, that having occurred on the first of March and the contract alleged by him having been consummated on the seventh of February, three months previous to this letter; that this is a letter between other parties, both of whom were in the Cambria Iron Co., and it is not shown, or offered to be shown, that the contents of it were ever communicated to the plaintiff.

By the court: The objection to the admission of the letter offered in evidence is sustained, the letter is excluded; exception.[5]

Further facts were made to appear as follows:

On March 1, 1881, the Cambria Iron Co., which was the largest stockholder of the Gautier Steel Co., completed the purchase of the interests of the other stockholders therein, and became the sole owner. From that date until July 1, 1881, the business of the steel company continued to be conducted under its reorganization as a limited partnership, but on the latter date, its accounts having been closed up, it was formally made a department of the iron company.

The plaintiff came to Johnstown on March 1, 1881. For the succeeding two months he was occupied principally in familiarizing himself with the business and with his duties, as superintendent; Charles Douglass, who had for some time been the superintendent of the steel company, still continued to act as such until May 1st, when the plaintiff took regular charge of the business. No entry was made upon the books of the steel company with reference to the plaintiff's salary until June 30th, when an account was opened in which he was credited with $2,333.33 as salary. This sum was equal to the amount of four months' salary at the rate of seven thousand dollars per year.

Plaintiff testified that this credit was entered by direction of Mr. Morrell, defendant's general manager, who informed him, at the time of giving such direction, that the remainder of his salary, three thousand dollars per annum, would be paid by the Philadelphia office of the iron company. In this account the plaintiff was debited with various sums received by him, and the account was balanced, showing the sum of $99.41 due him. This balance was then carried over to the books of the Cambria Iron Co., opened for the Gautier Steel department. The plaintiff was thereafter regularly credited therein with $583.33 monthly, and the sums so credited were paid to him at the Johnstown office.

The plaintiff testified that in 1882 he spoke to Mr. Morrell in regard to the payment of the three thousand dollars per annum, and the latter promised to arrange for its payment during a visit he was about to make to the company's general office at Philadelphia, but on his return said that he had forgotten it; that in the spring of 1883, Mr. Morrell's health having failed, and his mind having become a wreck, the plaintiff called the matter of salary to the attention of E. Y. Townsend, president of the company, who thereupon said that he knew of the salary contract made with Mr. Morrell, and the three thousand dollars would be paid; and that subsequently the plaintiff received from the Philadelphia office one thousand dollars on account of it. Mr. Townsend, testifying for the defendant, denied having had the conversation referred to, and denied that the one thousand dollars, received by the plaintiff from the Philadelphia office, was paid on account of salary, stating that it was advanced to and debited against him as a loan, and the debit was afterwards charged to the expense account for some reason that the witness could not remember. On cross-examination, the witness testified further:

" Q. Was it not a common practice for you to pay your superintendents at Johnstown a certain proportion of the salary through the Johnstown office, and another through the Philadelphia office ? A. Not merely superintendents; it was done in this way, and has always been done: A promising man develops there ; we, knowing the company's interest, are prompted to—if we advance him, on the Johnstown office books, his whole salary, what he is worth—we try to pay men what they are

Statement of Facts.

worth—it would demoralize the whole circle, every man; we don't know who is book-keeper or whose brother is; he may think he is a more valuable man, and sometimes a rival or competitive concern comes in and robs us of our best men and offers such prices—we don't want to part with them and we have got to pay them what they can get at other places; whenever we have a man worth that, we don't want to let him go, but we don't want to demoralize the whole populace by putting it on the books, and we pay him part from the Philadelphia office; it is done so the people of Johnstown and those there would not know what salaries they are getting. Q. The recipient is the only one that does know, and the Philadelphia office? A. Yes, sir. . . . . Q. Were not nearly all the men, receiving salaries of $5,000 and upwards, paid partly through the Philadelphia office? A. I should say not, decidedly; it is the exception rather than the rule; they are paid that way; that is, those that we try to pay them what they are worth."

On January 1, 1884, the plaintiff was appointed general manager, as the successor of Mr. Morrell, and the appointment was confirmed by the directors on January 17th. The plaintiff testified that the president, Mr. Townsend, to induce him to accept the position promised that his salary should be twelve thousand dollars per annum. This Mr. Townsend denied. The by-laws of the company provided that the salary of the general manager should be fixed by the board of directors. On January 24, 1884, the board fixed the plaintiff's salary at ten thousand dollars, to commence " with the current fiscal year." The same day Mr. Townsend wrote to the plaintiff, referring to the action of the board, and suggesting that plaintiff forward a statement of his account on the books, to the end of the current month. On January 25, the plaintiff replied, saying, " I will have statements taken from Gautier books from November 1st to date, and send you; " and on the following day he wrote to Mr. Townsend:

" I hand you statement of my account as per request, which shows a balance due the company. This is the first time this has occurred, and is due to my brother purchasing wagons of two parties, and giving orders on us for steel in payment; he has not responded and the account was charged my account.

          " Truly yours,          P. E. CHAPIN, G. M."

To this letter Mr. Townsend sent the following reply:

Statement of Facts.

"PHILADELPHIA, January 28, 1884.

"P. E. CHAPIN. Esq., General Manager, Johnstown Pa.

"Dear Sir: Your favor of the 26th inst. received. In regard to the matter of adjustment of your salary, we think it would be better for this office not to have anything to do with the matter of 'expense,' or items of debits which your account shows, and will therefore send you voucher with check on the last of this month 'for salary from November 1, 1883,' as per resolutions of the board:

Three months at $833 33⅓ . . . . . $2,500

Less salary paid by Gautier dept. for services to it
during above period . . . . . 1,750

Balance due . . . . . . $ 750

"And then you can settle the amount due by you on the Gautier books in cash, i. e., $324.28, as shown in the account rendered.

"Hereafter we will simply send you a voucher and check each month $833.33, without deduction, all of which I trust will be entirely satisfactory to you. . . . .

"Yours very truly,

"E. Y. TOWNSEND."

On January 29th, the plaintiff wrote acknowledging receipt of the foregoing and other letters, and saying: "The personal matter of salary is satisfactory to me." On January 31st, the plaintiff signed and forwarded to Philadelphia the following voucher:

"The Cambria Iron Co. to P. E. Chapin, Dr.
"1884.

"January 31. For salary (as per resolution of the
board) from November 1, 1883, to
January 31, 1884, three months at
$833 33⅓ . . . . . . $2,500 00
Less salary paid by Gautier Steel Depart-
ment for services to it during above
period . . . . . . 1,750 00   $750 00

I certify above to be correct transcript of account as entered.

T. F. DELCAMP, Book-keeper.

I certify that the above is correct.

Approved: E. Y. T.

"Received, Johnstown, Pa., January 31, 1884, of the Cambria Iron Company, seven hundred and fifty dollars, in full of above account.

"$750                                         P. E CHAPIN."

Charge of Court below.

Thereafter, until his retirement from the service of the company, the plaintiff was paid monthly, on vouchers made out at Philadelphia, the sum of $833.33, specified in the vouchers to be " salary for one month to date," except during a period of business depression, when there was a temporary reduction of all salaries and wages, the plaintiff's compensation was reduced for the time, with his assent, to $666.67 per month, which was paid to him.

The testimony being closed, the court, KREBS, P. J., charged the jury in part as follows :

This case may be divided into two branches; and in the consideration of these two branches, I shall not advert very much to the testimony, as it has been argued in your hearing at length by able counsel, and they have given their views of the interpretation that is to be placed upon it. . . . . I say to you, gentlemen of the jury, as a matter of law, that so far as the second branch of the case is concerned, Mr. Chapin is concluded by the action of the board of directors in fixing the salary at ten thousand dollars a year, and especially when coupled with his subsequent acceptance of and receipting for that amount without objection on his part.

We come now to the first branch of the case, which stands in an entirely different situation, in the view I take of it. . . . . .

The defendant company, in their first point, ask the court to say to you upon this branch of the case that

1. The books of the Gautier Steel Co., Limited, kept under the direction of the plaintiff up to the first day of July, 1881, wherein he was credited with his salary monthly at the rate of seven thousand dollars per annum, the balance on said account of ninety-nine dollars being transferred to his credit on the books of the Gautier department of the Cambria Iron Co., and the regular entries in these books of like credits for salary down to and including the month of January, 1884, together with the transmission of the account to Mr. Townsend, in connection with the letters of the plaintiff to Mr. Townsend of January 24, 25, and 28, 1884, and the voucher of January 31, 1884, constitute a written agreement that the salary of the plaintiff, as superintendent of the Gautier department, was seven thousand dollars per annum, which cannot be altered by parol tes-

Charge of Court below.

timony, and there can be no recovery by the plaintiff on his claim on that account.

Answer: Gentlemen of the jury, I do not so understand the law as applicable to the facts of this case. These different vouchers drawn monthly and receipted by Mr. Chapin, the letters and the books, are all evidence which you are to consider and give due weight to, in determining what are the facts in regard to his salary; but they are not absolutely conclusive as to what that salary was. They do not, in my judgment, constitute a contract that that salary should be seven thousand dollars a year. They are strong evidence for the jury, from which you may determine what the true relations between these parties were in regard to salary: but, taking the testimony of the defendant in this case, that there were officers of that corporation whose entire salary does not appear on the books of the corporation at Johnstown, we think that these papers, books, and vouchers would not be conclusive of that question, although they are strong evidence from which you are to determine what the rights of these parties are on this question of salary.[1]

It was testified by the plaintiff that at the time of, or some time after entering upon this employment, when his salary was credited up to him at seven thousand dollars a year, Mr. Morrell said to him that the balance of his salary, three thousand dollars a year, would be paid to him by the Philadelphia office. On that branch of the case, I am asked to say to you, in the defendant's fifth point, that

5. If a contract was made by Mr. Morrell with his son-in-law for a salary of ten thousand dollars, and an understanding was had between them that it should appear on the books as for seven thousand dollars, reserving his right to claim the additional three thousand dollars in the future, without communicating to the board, it would be a fraud on the company; and the plaintiff being a party to it, could not recover on it.

Answer: That is true as an abstract principle of law. If Mr. Morrell agreed with Mr. Chapin that the company should only be charged with seven thousand dollars on the books, and that three thousand dollars should be claimed at some future time, and the fact was not communicated to the company by Mr. Morrell or Mr. Chapin, and the company was not a party to it

Charge of Court below.

in any way, and it was not their habit or practice to do business in that way, it would be a fraud upon the company, and the plaintiff could not recover; but, gentlemen of the jury, upon that branch of the case, we submit to you the testimony of Mr. Chapin as to his arrangement with Mr. Morrell, and also the testimony of Mr. Townsend as to what the custom and habit of the company were in regard to the higher officials of the company in that respect, with accounts of salaries and the amounts as shown by the books of the corporation ; because, if the company has itself recognized that practice, that the general manager or the other officers of the company should pay to the officials of the company salaries beyond that which is shown on the books, they cannot complain that in this instance it was not right and proper. If you find that there was such an arrangement, it would not be a fraud upon them, because it would be presumed to be in accordance with the practice that they themselves have established.[4] . . . .

There is also a claim that the plaintiff has received a thousand dollars in addition to the seven thousand dollars ; and it is alleged on the part of the plaintiff that this was a recognition by the company that he was entitled to more than seven thousand dollars, and a recognition of the claim which he makes here that Mr. Morrell had agreed that three thousand dollars a year should be paid to him by the Philadelphia office, and should not appear on the books at Johnstown. On the part of the defendant, it is alleged that that is not a correct statement of that matter. They allege that it was paid to him for some other cause or purpose. This thousand dollars I speak of now, is a thousand dollars which Mr. Townsend says a check attached to the voucher shows was charged up to expense account, and which he cannot account for or explain. In the absence of any explanation, we cannot tell just how that one thousand dollars was paid. Mr. Townsend is unable to explain it, he says ; but he admits that on the corner of that check there was attached a lead-pencil memorandum of the treasurer and general secretary of the company which directed him to charge that up to expense account. And there is evidence in the case tending to show that the salaries of officials were charged to the expense account. It is for you to determine, under the best light you can get from this testimony, whether or not that

one thousand dollars was paid to Mr. Chapin on account of salary in excess of seven thousand dollars. If it was, it would be a material circumstance to be considered as to what arrangement was made with Mr. Chapin by the defendant corporation, through its general manager, Mr. Morrell, and recognized afterward by the corporation.

Now, gentlemen of the jury, without dwelling at length. upon this branch of the case, it is for you to take all this testimony, these letters, these vouchers, the testimony of the plaintiff, and the testimony of his wife, and determine from these what was the true relation between the company and Mr. Chapin from the first of July, 1881, till the first of January, 1884. If his salary was but seven thousand dollars, then he has no claim in this case; and your verdict would be for the defendant. If seven thousand dollars was to be the full amount that he was to receive, he has been paid in full and has no claim here. His case depends upon what was the relation, outside of what appears upon the books of the corporation; what was the arrangement entered into and made by Mr. Morrell, and whether or not that arrangement was subsequently, in any way, recognized by the defendant corporation. . . . .

The defendant's second point is as follows:

2. On the facts set forth in the first point, the voucher of January 31, 1884, is an account settled or stated of the Gautier department salary; and there being no fraud or mistake in making it, the plaintiff cannot recover.

Answer: I refuse to affirm this point.[2]

4. The plaintiff's statement and evidence showing that whatever salary was agreed upon at Cleveland was the salary of the plaintiff of the Gautier Co., Limited, and the alleged promise of Mr. Morrell that the Cambria Iron Co. would purchase the Gautier and he should be superintendent, imposed no obligation on the Cambria Iron Co. to pay ten thousand dollars salary.

Answer: Gentlemen of the jury, in answer to that point, I say this: That if Mr. Morrell went to Cleveland and agreed to pay Mr. Chapin ten thousand dollars as his salary, and at that time told him that negotiations were pending for the purchase of the outstanding interest not already owned by the Cambria Iron Co., in the Gautier Steel Co., Limited, then I

refuse this point; because, it would seem from the evidence that subsequently they did purchase and become the owners on the first of March, 1881; and if that promise and inducement were held out to him that he should become the superintendent at a salary of ten thousand dollars a year, it would be binding upon the defendant corporation.[3]

—The jury returned a verdict for the plaintiff for $7,700. A rule for a new trial having been discharged and judgment entered, the defendant took this appeal, assigning for error, inter alia:

1–4. The answers to defendant's points.[1 to 4]

5. The refusal of defendant's offer.[5]

*Mr. P. C. Knox* (with him *Mr. J. P. Linton*), for the appellant:

The questions that went to the jury were: (*a*) Whether the plaintiff had a contract with the Cambria Iron Co. to superintend its Gautier steel department for ten thousand dollars a year; and (*b*) whether the plaintiff stated and settled such an account with the defendant, at the rate of seven thousand dollars per year, as to preclude him from recovering. The assignments of error are especially pressed as they bear upon the submission of those two questions.

1. The plaintiff's case, as set up by himself in the statement of claim, exhibits no contract with the defendant relating to the steel department. His averments clearly state a contract with Mr. Morrell as the representative of the Gautier Steel Co., Limited; and it is expressly averred that no contract was made with the defendant, when it acquired and merged into its own business the business of the steel company. It would be useless to cite authorities to the effect that the defendant did not become liable upon such a contract of the steel company, by purchasing its business, or by reason of having been a large stockholder in the concern, and as such having "controlled and managed" it. We submit, therefore, that the court erred, under the pleadings and evidence, in submitting to the jury the question whether the plaintiff had a contract with the defendant for a salary of ten thousand dollars as superintendent of the steel department.

2. The court erred in not admitting the letter of D. J. Mor-

rell, to Dr. Wurts, dated May 4, 1881. The letter was an official communication by the chairman of the Gautier Steel Co., Limited, to a member of its board of managers in relation to the business of the company, and was admissible as such: Zoebisch v. Rauch, 133 Pa. 537. There is another theory upon which the letter should have been admitted. The plaintiff was bound to know that, under the limited partnership law, such a contract as he sets up was required to be put in a certain form, and be made by certain officials, to be valid; and if he did not himself communicate with the association for the purpose. of having the contract confirmed and put in proper shape, but intrusted the doing of this to Mr. Morrell, any communication in regard to the matter, made by Mr. Morrell, would be evidence: Mercantile N. Bank v. Lauth, 143 Pa. 53. And the letter was admissible as part of the res gestæ. It was sufficiently near in point of time to be so regarded: Rinesmith v. Railway Co., 90 Pa. 262.

3. From the facts set out in the plaintiff's first point, a clear, definite, and certain contract in writing, fixing the amount of the plaintiff's salary, can be deduced: Jerod v. Myer, 4 Mart. 698. The voucher of January 31, 1884, has every element of a written contract. It is just as distinct as if the plaintiff had written, "My salary as superintendent of the Gautier Steel department is seven thousand dollars," and had signed this. It is unquestionably a stated account, which cannot be set aside without alleging mistake or fraud. There could be no mistake. The plaintiff says he told Mr. Townsend in 1883 that the contract was for ten thousand dollars, but he continued on and received his salary after that at the rate of seven thousand dollars, and acknowledged that to be the rate in writing. Mr. Townsend, however, denies that such notice was given him; and therefore that fact is unproved, the testimony being simply oath against oath: Sower v. Weaver, 78 Pa. 447; Horton's App., 13 Pa. 67; Paul v. Carver, 24 Pa. 207; Pusey v. Wright, 31 Pa. 387; Hassler v. Bitting, 40 Pa. 68; Slemmer's App., 58 Pa. 155; Juniata Building Ass'n v. Hetzel, 103 Pa. 507; Phillips v. Meily, 106 Pa. 536; Campbell v. Patterson, 95 Pa. 447.

4. The conclusiveness of the facts stated in the defendant's first and second points, is not at all affected by the further fact

that some half dozen of the company's officers received a por-
tion of their salaries from the Philadelphia office.   These pay-
ments were made in the regular course of business on monthly
or quarterly vouchers.   That the plaintiff was not on this list
and received nothing in this way, does not tend to show that
he was entitled so to receive anything, nor does it tend to cor-
roborate his claim that he had a contract to be paid in this way,
but on the contrary, tends most strongly to discredit it.   There
is no evidence that he was an official of the position or charac-
ter thus exceptionally treated.   In view of the fact that the
plaintiff's account was kept by clerks under his own control,
and of the fact that he deliberately presented a copy of it to
the defendant as his own account, apologized for the indebted-
ness shown by it, and paid the same, what force can be given
to the fact, known to him when he stated the account, that the
full amount of the salaries of certain other officials did not ap-
pear upon the books at Johnstown?

*Mr. John H. Orvis* (with him *Mr. W. Horace Rose*), for the
appellee:

1. We concede that the entries in the books would be evi-
dence against the plaintiff, but deny that they " constitute a
written agreement."   The contract with the plaintiff was made
in the early part of 1881, and the entries made during the suc-
ceeding three years are not the contract itself, but only evi-
dence as to what it was.   Nor could the voucher of January 31,
1884, be an account settled of the plaintiff's salary as superin-
tendent of the Gautier Steel department, from July 1, 1881,
to January 31, 1884.   It contains no reference to salary except
for the months of November, December and January, and for
them it states, not what salary the plaintiff was to receive, but
only what had actually been paid by the Gautier Steel depart-
ment on account of salary.

2. In making a contract with the plaintiff at Cleveland, Mr.
Morrell was not acting in his capacity as chairman of the Gau-
tier Steel Co., but in his capacity as general manager of the
defendant corporation; and he made the contract in view of
the contemplated merger of the steel company in the defend-
ant company.   To the criticism by appellant's counsel of the
statement of claim, two answers may be made :   (*a*)  The state-

ment of claim was not demurred to, and after a trial on the
merits, technical objections come too late : Graff v. Graybill, 1
W. 428; Shoenberger v. Zook, 34 Pa. 25; Insurance Co. v.
Seitz, 4 W. & S. 273; East Union Tp. v. Comrey, 100 Pa. 362;
and (*b*) the construction sought to be put upon the statement
of claim, is not a fair one, and is not in accordance with the
obvious and full meaning of the language used.

3. The letter of Mr. Morrell to Dr. Wurts was not evidence
against the plaintiff for any purpose. It was written by Mr.
Morrell as chairman of the Gautier Steel Co. to Dr. Wurts as
one of the managers of the same company. It had no refer-
ence to the contract with the plaintiff to act as superintendent
of the defendant's steel department, but related to his position
as superintendent of the Gautier Steel Co., during the brief
period of its future existence. It may have been written for
the reason that it was desirable to have, on the records, some
appearance of a contract for salary, made by the managers, be-
tween the nominal superintendent and that organization, but
it throws no light on the contract relation between the plaint-
iff and the defendant. A conclusive objection to its admission
is that it was written nearly three months after he accepted
the situation offered him, and two months after he entered the
company's service.

OPINION, MR. JUSTICE CLARK :

It seems to be the undisputed evidence in this case that, at
the time of the contract of February 7, 1881, between Daniel
J. Morrell and Philip E. Chapin, the said Daniel J. Morrell was
president of the Gautier Steel Co., Limited, and also manager
of the Cambria Iron Co., and that throughout the entire nego-
tiations the absorption of the former company by the latter
was in the contemplation of the parties. It is further conceded
that on March 1, 1881, when Chapin entered upon the perform-
ance of his duties, what had previously been in contemplation
was accomplished, and from thenceforth the Gautier Steel Co.,
Limited, which was a mere partnership, was merged in and was
to be conducted as the Gautier Steel department of the Cambria
Iron Company. It is true that, as a matter of book-keeping,
and for convenience in settling and adjusting the accounts, the
name of the Gautier Steel Co., Limited, was preserved or re-

tained upon the books, and the business conducted in that form until the first of July thereafter, when the name and operations of the limited partnership ceased, and the business, according to the plan in contemplation, was conducted as a department of the Cambria Iron Company. In whatever name or form the business was conducted from March 1, 1881, the entire plant from that date was owned by and was conducted for the Cambria Iron Company. The contract would seem to have been made with special reference to a future event, which occurred precisely as anticipated. The foundation of the action is therefore, not upon the allegations that Chapin was employed by the Gautier Steel Co., Limited, but by the Cambria Iron Co., for which the services were in fact rendered.

The plaintiff's statement of claim is perhaps open to criticism for its want of perspicuity and clearness, but, as there was no demurrer, after a trial on the merits, verdict, and judgment no defect would be fatal, unless it is shown to have injuriously affected the trial; the proper amendment will be considered to have been made: Erie City I. Works v. Barber, 118 Pa. 19.

The theory of the plaintiff's case is that, although he received only seven thousand dollars annually as superintendent in the closing up of the Gautier Steel Co., Limited, and afterwards as superintendent of the Gautier Steel department, as shown by the books, yet the agreement was that he was to receive three thousand dollars more, directly from the Philadelphia office; that his actual salary was ten thousand dollars ; and, although his account for services in the Johnstown office was kept under his own supervision upon the basis of a salary of seven thousand dollars, and monthly vouchers were made out, and credits of $583.33 regularly entered, all this was done in pursuance of a mutual understanding to that effect between him and Daniel J. Morrell, the manager of the company at the time of his original employment, of which the board of directors had notice ; and that this agreement was according to the practice of the company with reference to a certain class of its employees. The company does not deny that to some extent this practice did prevail with respect to certain of the officers and employees of the company, especially those drawing the highest salaries ; but it is denied that this practice was at any time applied to the plaintiff. Mr. Chapin's testimony, however, is to the effect

that such was the agreement with Mr. Morrell, and that, in pursuance of that agreement, one thousand or two thousand dollars was actually paid to him from the Philadelphia office. He further testified that after Mr. Morrell's decease, when he called the matter to the attention of Mr. Townsend, the president of the board, Mr. Townsend admitted that Mr. Morrell had told him of the agreement, and that he promised payment would be made in accordance with its terms. He says: "I saw Mr. Townsend, in the spring of 1883, with reference to the balance due me as general superintendent of the Gautier department. It was the first time I brought the matter to his attention,—in the spring of 1883, after my second year had expired. I told him what my agreement was with Mr. Morrell in Cleveland, what Mr. Morrell had agreed to pay me, and he said it should be all right; and he also said at that time that he understood it, Mr. Morrell had informed him, although Mr. Morrell didn't advise him in his letter, when he wrote him of my coming, of the amount of my salary." In another part of his examination, speaking of the same conversation, he says: "He (Mr. Townsend) admitted the agreement perfectly, and said that the amount would be paid. He gave me a thousand dollars on that account on the 31st May, 1882. He had a memorandum, at the time I called attention to it, of the amount."

Undoubtedly the entries upon the books of the Gautier Steel Co., Limited, and of the Gautier Steel department, together with the accounts transmitted to Mr. Townsend, and the letters and vouchers referred to in the defendant's first point, were not only evidence, but strong evidence, from which the jury might infer the existence of a contract on the part of Mr. Chapin to perform the duties of superintendent at a salary of seven thousand dollars; but these various items of proof did not in any proper sense constitute a written contract which could not be varied or affected by parol proof. They undoubtedly furnished strong proof of a contract to serve as superintendent at a salary of seven thousand dollars, but there was other proof to a different effect, which the jury was not at liberty to disregard. In determining what the contract was, the jury were bound to consider, not a part of the evidence, but all the evidence on that subject. If Mr. Chapin's testimony is believed, especially in view of the admitted practice of the company, these book-entries,

vouchers, letters, etc., were in great measure consistent with
his theory of the case, for doubtless the accounts, vouchers, etc.,
covering the salaries of all those who received additional sums
from the Philadelphia office, were in the same condition. The
exact nature of the contract between the parties, and the
amount of the plaintiff's annual salary, upon a consideration of
the accounts as they were kept, the vouchers, receipts, letters,
and generally upon a consideration of all the evidence in the
cause, oral or written, bearing upon that question, was for the
jury.

That the negotiations between the Cambria Iron Co. and the
Gautier Steel Co., Limited, were incomplete at the time of the
contract between Morrell and Chapin, is immaterial, if the em-
ployment was in view of the consummation of that event, and
to provide a superintendent when it should occur. Besides, it
is clear that no services of any character were at any time ren-
dered by Chapin for the Gautier Steel Co., Limited, nor does
it seem to have been in contemplation that he would render
service to that company; for, as we have said, on the very day
he entered into his employment the Gautier company was
merged in the Cambria Iron Co., and thereafter, except as a
mere matter of book-keeping, had no existence. It is true that
the employment of a superintendent by the manager was
subject to the approval of the board of directors, but if, in rec-
ognition of the terms alleged, a portion of this extra salary was
actually paid to Mr Chapin from the Philadelphia office, and
Mr. Townsend, the president, to whom frequent statements
showing the balance of salary due are said to have been ren-
dered, " admitted the agreement perfectly," saying the " amount
would be paid," the jury might, under the admitted practice of
the company in this respect, readily infer that Mr. Morrell's
contract had been approved. Of course, all these statements of
Mr. Chapin were strongly denied, but the mere denial was not
enough to withdraw that question from the jury. It is the
peculiar province of the jury to determine the veracity of the
witnesses, and settle the conflicts in the evidence.

We are of opinion that the case was very carefully consid-
ered by the court below in the general charge and in the an-
swers to the point. The questions of fact involved were fully,
fairly, and impartially submitted; and if the plaintiff has any

right to complain, it is of the jury, and not of the court. Nor was there any error in excluding the letter of Daniel J. Morrell to Dr. Wurtz, dated May 4, 1881. It was written long after the contract was complete, and after Chapin had actually entered upon his employment. It was no part of the res gestæ. The transaction was complete, and the negotiations ended. The contract had been closed, and the rights of the parties fixed, for two months and more before the letter was written.

The judgment is affirmed.